IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **INMOMENT, INC.,**<br><br>                              Plaintiff,<br><br>v.<br><br>**MARKET & OPINION RESEARCH INTERNATIONAL LIMITED**; **IPSOS MORI U.K. LIMITED**; and **DOES 1 through 10**,<br><br>                              Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:21-CV-00513-JNP-DAO<br><br>District Judge Jill N. Parrish<br>Magistrate Judge Daphne A. Oberg |

Plaintiff InMoment, Inc. ("InMoment") sued Market & Opinion Research International Limited ("MORI") and Ipsos MORI UK Limited ("Ipsos") (collectively, "Defendants")[1] in state court, alleging breach of contract and related claims. ECF No. 2-1. Defendants removed the action to this court pursuant to 28 U.S.C. § 1332(a). ECF No. 2. InMoment now moves for summary judgment on its breach of contract claim, asserting that it is entitled to $1,415,000 in damages. ECF No. 47. The court denies InMoment's motion based on the existence of factual disputes that are material to the interpretation of the ambiguous contracts that underlie InMoment's claim.

**BACKGROUND**

InMoment is a Utah-based company that offers its customers an "integrated customer experience approach by developing technology to obtain and analyze customer feedback through

---

[1] InMoment's briefing consistently conflates MORI and Ipsos, the two Defendants in this action. *See* ECF No. 47, at 1 (collectively defining Market & Opinion Research International Limited and Ipsos MORI U.K. Limited as "Ipsos"). InMoment's failure to specify which party it seeks judgment against is one reason for the court's denial of its partial summary judgment motion. *See* Section II(C)(iii), *infra*. Due to InMoment's inattentive briefing on this matter, the court is left to follow in InMoment's wake, referring to MORI and Ipsos collectively as "Defendants" in all but the rare instances wherein InMoment specified which Defendant took a particular action.

customer surveys[.]" ECF No. 47, at 3. GfK, a German entity, partnered with InMoment to jointly provide services in connection with a customer experience insights program ("CEIP" or "Program") for Jaguar Land Rover ("JLR"). InMoment agreed to "migrate all of JLR's existing customer experience programs that were operating on a different technology platform [Echo] to a new platform that InMoment would build." *Id.* InMoment and GfK documented their agreement in two related contracts. First, they entered a "Reseller Agreement," through which GfK SE obtained the right to "resell InMoment's products and services" as "part of an integrated . . . service offering." ECF No. 47-2. Pursuant to the Reseller Agreement, GfK then entered an agreement for InMoment to provide subcontractor services for the JLR CEIP, including by creating the Program's reporting portal. ECF No. 47-3 ("SOW #1"). JLR hired GfK to provide services related to its CEIP through an agreement with a two-year term. ECF No. 47-12, at 2. By contrast, SOW #1 had a three-year term, with the first year beginning on April 1, 2018. *Id.*, at 2. GfK agreed to pay InMoment $1,415,000 annually, billable monthly, for its contributing work on the Program. *Id.* "Years 2 and 3" of SOW #1 were "contingent on" two conditions precedent: (1) the "successful migration of the existing JLR programs to the InMoment portal during year 1" and (2) "the subsequent extension of the GfK contract with JLR beginning in April, 2019[.]" *Id.*, at 3.

On October 10, 2018, during SOW #1's first year, GfK sold Ipsos certain assets pursuant to a Local Asset Deal Arrangement (the "Acquisition Agreement"). ECF No. 47-6. One week later, a GfK employee explained to JLR that under the acquisition, "closed on 10th October[,]" "ongoing contacts (CEIP, CQI, Reviews, Mystery Shopping) will remain with GfK. To maintain delivery of these programs, . . . all of the current teams that have transitioned to Ipsos . . . will carry on as before . . . . [T]he management teams (now Ipsos employees) will be working as sub-contractors

2

with the basic functions still delivered by GfK Operations (e.g. data collection, data processing)." ECF No. 56-1, at 78.

On December 12, 2018, a GfK employee emailed his counterpart at InMoment to introduce InMoment's new "senior Ipsos contact," Ben Llewellyn. ECF No. 47-11, at 3. This email stated that it would be important for InMoment to get to know Ipsos's Mr. Llewellyn "particularly . . . given that many of the projects currently being transitioned to InMoment (including JLR) will migrate to Ipsos over time." *Id.* A month later, Mr. Llewellyn reached out to InMoment's staff, asking to discuss the Defendants' relationship with InMoment and ensure progress was being made "to ensure we hit our end-March deployment deadline." *Id.*, at 2. On February 13, 2019, Mr. Llewellyn again reached out to InMoment with three questions "about the JLR contact[.]" ECF No. 47-12, at 3. Mr. Llewellyn wanted to discuss changing the contract "to InMoment and Ipsos as opposed to IM and GfK[,]" changing the "term of the agreement" because GfK agreed to "3 years with [InMoment]" but only a "1+1 with JLR[,]" and "[c]onfirmation of [the] statement of work" because "there is a lot of ambiguity at the moment." *Id.*, at 2.

InMoment's understanding was that under the Acquisition Agreement, "GfK would have had to agree to pay all outstanding liabilities as part of the conditions of sale." ECF No. 47-13, at 6. As such, "InMoment . . . issued invoices for the period to 31st March [2019] to GfK UK Ltd[.]" *Id.*, at 4. After the Acquisition Agreement was finalized, however, GfK stopped paying InMoment's monthly SOW #1 invoices. When GfK had fallen five months behind on these payments, InMoment asked Defendants to ensure that GfK paid those liabilities. ECF No. 47-13, at 2–7.  GfK eventually did so. *Id.* Beginning on April 1, 2019, InMoment began invoicing Ipsos instead of GfK at the request of Ipsos's accounts payable clerk. *Id.*

Notwithstanding Defendants' acquisition of certain GfK assets and the transition of

projects between those two entities, InMoment continued making progress on SOW #1 throughout that contract's first year. Initially, GfK had planned to have InMoment launch its new portal for the JLR Program in November 2018, *see* ECF No. 47-8, at 3–4, but that deadline was later pushed back to March 2019, the final month of SOW #1's first year, *see* ECF No. 47-9, at 2. Defendants and InMoment jointly launched the new portal on March 5, 2019. ECF No. 47-18, at 2–3. As part of the launch, Ipsos noted that "[h]undreds of thousands of pieces of sample data have been ported from Echo to InMoment." *Id.*, at 3. "Final quality checks" continued "post launch." *Id.*

In April 2019, as the parties entered SOW #1's second year, no discussion occurred regarding SOW #1's two conditions precedent. After that date, however, InMoment continued providing subcontractor services related to the JLR CEIP. *See* ECF No. 54-1, at 7 (listing InMoment among Defendants' approved subcontractors in a new statement of work under which Defendants continued providing services for the JLR CEIP after April 2019). For the entirety of what would have been SOW #1's second year, InMoment continued invoicing Ipsos monthly, and Ipsos paid InMoment the annual rate set out in SOW #1 for that contract's second year: $1,415,000. *See* ECF No. 47-14; *see also* ECF No. 47-7, at 15.

In March 2020, due to the onset of the COVID-19 pandemic, JLR suspended its CEIP, informing Defendants that the Program would not continue for a period of at least six months. At JLR's request, InMoment authorized several JLR employees to retain access to the Program's portal throughout this period. ECF Nos. 60-6, at 2–4; 56-2, at 20. In internal emails, however, various InMoment employees stated their understanding that the suspension of the program effectuated a termination of InMoment's relationship with Defendants, which they understood to be contingent upon Defendants' retention of their contract with JLR. *See* ECF Nos. 56-2, at 2, 20; 54, at 9.

JLR's contract with Defendants expired at the end of March 2020. ECF No. 56-1, at 2. JLR issued a request for proposal ("RFP") in or around October 2020 to select a contractor with which to continue the Program. *Id.*, at 151. Defendants submitted a bid to retain their contract with JLR and notified InMoment that it would not be Defendants' selected subcontractor for the JLR Program going forward. *Id.*, at 199. Through a subsidiary, InMoment submitted its own bid on the RFP in an attempt to retain its right to work on the JLR Program. On September 30, 2020, JLR announced that Defendants had won the RFP and retained their contract with JLR. ECF No. 56-2, at 31–32. JLR noted, however, that Defendants would continue their work on the JLR Program "now in partnership with Medallia who will be responsible for the delivery of the Customer Experience (CX) portal. We are confident that this will be a significant improvement over InMoment[.]" *Id.*

InMoment did not invoice Defendants for SOW #1's third year after JLR suspended the Program. Around October 2020, after Defendants won the RFP to retain the JLR contract with a new subcontractor, InMoment resumed invoicing Defendants under SOW #1, asserting that Defendants had assumed SOW #1 through the Acquisition Agreement and SOW #1's conditions precedent had been satisfied, thereby entitling InMoment to payment for that contract's third year despite having ceased providing services for Defendants. *See* ECF No. 56-2, at 40–42. When Defendants refused to pay these invoices, InMoment initiated the present suit. Now, InMoment seeks partial summary judgment on its breach of contact claim, for which it claims it is entitled to $1,415,000 for SOW #1's third year. Defendants oppose the motion, disputing both InMoment's claim that the Acquisition Agreement effectuated Defendants' assumption of SOW #1 and its assertion that SOW #1's two conditions precedent were satisfied.

**SUMMARY JUDGMENT STANDARD**

"Summary judgment is appropriate if the admissible evidence shows 'that there is no

5

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Allen v. SouthCrest Hosp.*, 455 Fed. App'x 827, 830 (10th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). To obtain summary judgment, a movant that bears the ultimate burden of proof at trial must therefore show that no reasonable jury "could find other than for [that] party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (citation omitted). The movant bears the burden to produce evidence establishing the absence of a genuine issue of material fact on the claims or elements upon which it seeks judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Kannady v. City of Kiowa*, 590 F.3d 1161, 1168-69 (10th Cir. 2010) (citations omitted). "[I]n response to a properly supported motion for summary judgment," the opposing party "must produce sufficient evidence for a reasonable trier of fact to find in its favor at trial on the claim or defense under consideration." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

"A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *See Fuit v. Extreme Prod. Grp., LLC*, No. 1:16-CV-35-RJS, 2018 WL 1801914, at *1 (D. Utah Apr. 13, 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 212, 248 (1986)). Moreover, "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (cleaned up). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. "[T]here is no issue for trial unless

there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

**ANALYSIS**

InMoment's motion turns upon three critical factual questions: 1) whether Defendants assumed SOW #1 through GfK's sale of certain assets pursuant to the Acquisition Agreement; 2) whether InMoment successfully migrated the JLR Program onto its platform during SOW #1's first year; and 3) whether there was a subsequent extension of GfK's agreement to provide services for JLR's CEIP. At every turn, the court finds ambiguous contracts and disputed facts, which the parties attempt to avoid through claims of judicial estoppel and waiver. For the reasons stated below, the court declines the parties' various requests to invoke these doctrines. Instead, the court denies summary judgment because there exist multiple issues of disputed fact regarding the intended meaning of ambiguous provisions in the Acquisition Agreement and SOW #1.

## I.    THE ACQUISITION AGREEMENT

InMoment's claim that Defendants breached SOW #1 by failing to pay $1,415,000 for that contract's third year requires a prerequisite finding that Defendants assumed GfK's duty to pay InMoment under SOW #1. After declining to estop Defendants from arguing that they did not assume SOW #1, the court concludes that the Acquisition Agreement is ambiguous as to its effect on SOW #1's assignment and that there exists a triable issue of fact as to the Acquisition Agreement's intended effect. The court therefore denies summary judgment on this ground.

### A.  JUDICIAL ESTOPPEL DOES NOT APPLY

InMoment aims to prevent Defendants from arguing that they did not assume SOW #1 pursuant to the Acquisition Agreement's text. If Defendants truly believed this argument, InMoment claims, they "would have argued [it] from the beginning" of litigation. Because

Defendants did not raise this argument earlier, InMoment urges the court to reject this "new sham fact issue." ECF No. 60, at 15 (internal quotation marks omitted). The court declines InMoment's invitation.

### i.    Legal Standard

"The purpose of judicial estoppel 'is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Queen v. TA Operating, LLC* 734 F.3d 1081, 1087 (10th Cir. 2013) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)). Three factors inform the court's decision whether to apply the doctrine of judicial estoppel: (1) "a party's subsequent position must be clearly inconsistent with its former position"; (2) "a court should inquire whether the suspect party succeeded in persuading a court to accept that party's former position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "the court should inquire whether the party seeking to assert an inconsistent position would gain an unfair advantage in the litigation if not estopped." *Id.* (quoting *Eastman v. Union Pac. R.R.*, 493 F.3d 1151, 1156 (10th Cir. 2007)). "Additional considerations" may also inform "the doctrine's application in specific factual contexts." *Id.* (quoting *New Hampshire*, 532 U.S. at 751).

"The burden falls on the moving party to show the need" for judicial estoppel—"a difficult task given 'our reluctance to impose the harsh remedy.'" *Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1207 (10th Cir. 2017) (quoting *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 767 F.3d 987, 988 (10th Cir. 2014)). The court applies judicial estoppel "narrowly and cautiously," finding it appropriate only when "less forceful remedies are inadequate[.]" *Id.* at 1207–08 (citations omitted). Moreover, judicial estoppel "only applies when the position to be estopped is

one of fact, not one of law." *Banclosure, Inc. v. FDIC*, 796 F.3d 1226, 1240 (10th Cir. 2015) (citing *United States v. Villagrana-Flores*, 467 F.3d 1269, 1279 (10th Cir. 2006)).

### ii.    Analysis

Judicial estoppel exists to "prevent[] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire*, 532 U.S. at 749 (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)); *see also Ordonez v. Canyons Sch. Dist.*, 788 Fed. App'x 613, 616 (10th Cir. 2019) (unpublished). InMoment alleges that Defendants' opposition to InMoment's summary judgment motion is inconsistent with the positions Defendants took when asserting affirmative defenses, making initial disclosures, providing written discovery responses, and responding to proposed Rule 30(b)(6) deposition topics. But InMoment neither alleges nor demonstrates that Defendants' current position is factually inconsistent with or contradictory to any of the positions it has affirmatively taken in the litigation, and at no point have Defendants misled the court. As a result, the court declines to exercise its equitable powers to prevent Defendants from disputing the claim that they assumed SOW #1 through the Acquisition Agreement. The court finds judicial estoppel inapplicable because its equitable purpose would not be served by preventing Defendants from arguing that they did not assume SOW #1.

### B.  THE ACQUISITION AGREEMENT'S TEXT IS AMBIGUOUS

### i.    Legal Standard

Under New York law,[2] ambiguity is a question of law to be determined by the court from

---

[2] The Acquisition Agreement contains a choice of law provision that states "[t]his Agreement shall be governed by . . . the Laws of Germany[.]" ECF No. 49-6, at 28. Despite this, both parties elected to present their arguments under New York law. The court permits the parties to do so for three reasons. First, there appears to be some basis in Tenth Circuit law for permitting parties to avail themselves of a particular state's laws in contract disputes. *Trans-Western Petroleum, Inc. v. United States Gypsum Co.*, 584 F.3d 988 (10th Cir. 2009) (citing *Mullin v. Travelers Indem. Co.*, 541 F.3d 1219 (10th Cir. 2008)) ("The parties' arguments rely on Utah law; therefore, we will assume that Utah law applies."). Second, by electing to litigate InMoment's summary judgment motion under New York law, the parties

within the contract's four corners. *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (citing *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir 1992); *Kass v. Kass*, 91 N.Y.2d 554, 566, 696 N.E.2d 174, 673 N.Y.S.2d 350, 356 (1998)). When reasonable minds could differ as to the meaning of a contract's terms, that contract's text is ambiguous, and "extrinsic evidence as to the parties' intent may be properly considered." *Id.* at 397; *see also* 67 *Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 248, 333 N.E.2d 184, 371 N.Y.S.2d 915, 918 (1975). However, summary judgment may be granted only when extrinsic evidence "creates no genuine issue of material fact" and "permits interpretation of the agreement as a matter of law." *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 375–76 (S.D.N.Y. Sept. 18, 2006) (quoting *Nycal Corp. v. Inoco P.L.C.*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997)). On the other hand, summary judgment should be denied when extrinsic evidence supports more than a "single interpretation," because such circumstances demonstrate that there remains a disputed question as to the material fact of the contracting parties' intent. *Id.* at 376 (quoting *Nycal*, 988 F. Supp. at 299, n.11).

### ii.     The Acquisition Agreement is Ambiguous as a Matter of Law

Evidence from within the Acquisition Agreement's four corners could support reasonable disagreement as to whether it effectuated Defendants' assumption of SOW #1. The court therefore determines that the Acquisition Agreement is ambiguous, just as InMoment recognized in its own brief. *See* ECF No. 60, at 10 ("[T]he Acquisition Agreement may be ambiguous" as to whether SOW #1 was among the assets and liabilities that GfK transferred to Defendants and "extrinsic

---

have likely painted themselves into a corner to the extent that judicial estoppel would prevent either party from attempting to apply the laws of Germany or Utah to these same issues at a later stage in the case. Third, as outlined in this decision, the court identifies an alternative ground upon which it denies summary judgment. The court's disposition on this motion would be no different, then, if another jurisdiction's laws applied to the Acquisition Agreement.

evidence" must therefore be considered in an attempt to "resolve the ambiguity.").

Some portions of the Acquisition Agreement's text support Defendants' position that this agreement did not reassign SOW #1 from GfK to Defendants. Section 4 of the Acquisition Agreement expressly excluded the transfer of "Pending Projects," stating that "'statements of work' with customers and 'purchase orders' with suppliers, . . . shall remain with the Seller." ECF No. 47-6, at 16. InMoment notes, however, that SOW #1 is not clearly implicated by this language because JLR, the "customer" relevant to SOW #1, is not a party to that contract. ECF No. 60, at 9.

Both parties recognize that "JLR CEIP" appears dozens of times throughout the Acquisition Agreement. That phrase is listed repeatedly among Defendants' "Assumed Agreements" listed in Exhibit 4.4.1(a), *see* ECF No. 47-6, at 182–195, but appears just as many times in the subsequent exhibit listing "Pending Projects" expressly excluded from sale, *see, e.g., id.*, at 201. Exhibit 2.1.3(A)(h) also lists recent projects among the Acquisition Agreement's general sold assets, and that list names items such as "JLR CQI Pilot," *id.*, at 65, "Jaguar LR – CEIP 17/18, North America En," *id.*, at 66, and "JLR Global reporting Q4 2016/17," *id.*, at 68. While many lines throughout the exhibits appear plausibly related to SOW #1, not one of them references SOW #1 or InMoment by name. Many of the references to "JLR CEIP" in the Acquisition Agreement also predate SOW #1, which did not take effect until April 2018. Any mention of the JLR CEIP could just as easily refer to SOW #1 as it could refer to any other agreement between Defendants and their other subcontractors or JLR itself.

The foregoing evidence led InMoment to conclude that the Acquisition Agreement may simply be ambiguous as to whether it transferred SOW #1 from GfK to Defendants, and the court agrees. No conclusion can be reached from the four concerns of the contract except that reasonable minds could differ as to the terms' intended meaning and effect.

The court therefore finds that the contract is ambiguous as a matter of law and proceeds to consider whether the extrinsic evidence regarding the agreement's intended effect permits the court to interpret its text as a matter of law.

### iii.    Extrinsic Evidence Creates a Triable Issue of Fact as to the Acquisition Agreement's Intended Meaning

The parties support their diverging factual accounts of their contractual relationship with evidence beyond the four corners of the Acquisition Agreement. Viewed in its totality, however, this evidence does not permit the court to resolve the Acquisition Agreement's ambiguity as a matter of law. Instead, the evidence relied upon by the parties highlights the central factual dispute remaining in this case, which necessitates the denial of summary judgment. The court cannot invade the province of the jury by weighing contradictory extrinsic evidence to engage in factfinding as to contracting parties' intent. *See Media Tenor Int'l AG v. Medco Health Solutions, Inc.*, No. 13-CV-7223-DLC, 2014 U.S. Dist. LEXIS 87921, at *16 (S.D.N.Y. June 27, 201) ("[T]he contract is ambiguous, and the intent of the parties is a jury question, which may be resolved with the assistance of extrinsic evidence."); *IBM Credit Financing Corp. v. Mazda Motor Mfg. Corp.*, 542 N.Y.S.2d 649, 650, 152 A.D.2d 451 (N.Y. App. Div. 1989) (quoting *Hartford Acc. & Indem. Co. v Wesolowski*, 33 N.Y.2d 169, 172, 305 N.E.2d 907 (N.Y. 1973)) ("[W]here a 'determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury[.]'").

Some evidence in the record supports InMoment's proposition that Ipsos assumed SOW #1 through the Acquisition Agreement. First and foremost, Ipsos paid InMoment $1,415,000 between April 2019 and March 2020—the exact amount agreed upon for SOW #1's second year—while InMoment continued providing subcontractor services related to Defendants' operation of

the JLR CEIP. *See* ECF No. 47-14 (invoices); *see also* ECF No. 47-7, at 15. InMoment's view of the parties' intent in drafting the Acquisition Agreement is further supported by the reassignment of GfK's employees working on the JLR Program to Ipsos without any substantive change in their duties. ECF No. 47-7, at 8–12. Additionally, during the second year of InMoment's performance, Ipsos asked to discuss three items, including a "[c]hange of the term of agreement," because Ipsos was in a "crazy position where GfK agreed 3 years with [InMoment] but only have 1+1 with JLR[.]" ECF No. 47-12, at 2. In response, InMoment wrote that "[w]e are currently in the 2nd year of a 3 year term, the dates are clearly defined and will not change." ECF No. 47-15, at 3. No further discussions appear to have been had on this point and a new statement of work between Ipsos and InMoment was never executed. All of this suggests that from April 2019 until March 2020, InMoment performed its obligations under SOW #1, and Ipsos paid InMoment for those services, recognizing the parties' ongoing contractual relationship.

But Defendants assert this view is mistaken and provide additional extrinsic evidence to support their contradictory factual account. Around the end of SOW #1's first year, InMoment threatened to stop providing services related to the JLR Program because five months of invoices were in arrears—InMoment had not been paid for its services since the Acquisition Agreement's finalization. ECF No. 47-13, at 6–7. But InMoment did not ask Defendants to pay those invoices. Instead, InMoment's Partnerships Director, Mr. Steve Raher, stated to Defendants that InMoment understood the Acquisition Agreement required "GfK . . . to agree to pay all outstanding liabilities as part of the conditions of sale[,]" including its liabilities to InMoment under SOW #1. *Id.*, at 6. InMoment asked Defendants to help ensure that *GfK* paid the five outstanding invoices for SOW #1's first year. Defendants did so, and GfK paid the five outstanding invoices. *Id.*, at 2. InMoment's CFO, Mr. Mark Webb, later disclaimed Mr. Raher's understanding as to GfK's retention of its

liabilities to InMoment under SOW #1. *Id.*, at 3. But InMoment provides no other explanation as to why GfK paid InMoment for the entirety of SOW #1's first year if Ipsos assumed that contract months earlier. Defendants also cite emails from InMoment's Mr. Raher, asking to "set up a call to up on" a "new Statement of Work." ECF No. 56-1, at 349. While Ipsos's Mr. Llewellyn's request to discuss a "[c]hange of the term of agreement" supports an inference that Ipsos and InMoment had a contract in place after April 1, 2019, Mr. Raher's email supports the opposite inference—that Ipsos did not assume SOW #1, such that a new statement of work needed to be negotiated.

Defendants urge the court to infer from these facts that the Acquisition Agreement transferred GfK's contract with JLR to provide the CEIP, but that GfK retained its liabilities to InMoment under SOW #1. Defendants then ask the court to infer that the parties' performance and payment between April 2019 and March 2020 were conducted under an unwritten agreement, and that Defendants' "attempt to renegotiate SOW #1's terms" was in fact merely an attempt to establish *a* written statement of work for InMoment's performance of subcontractor services after the end of SOW #1's first year. InMoment's internal discussions regarding the need to establish a new statement of work to take effect in April 2019 supports this argument because it would presumably be unnecessary to establish a new statement of work if SOW #1 remained in effect. *See, e.g.,* ECF No. 56-1, at 349, 379, 381, 385, 406.

In short, InMoment's position is inconsistent with the fact that GfK paid InMoment's invoices for SOW #1's first year, including after the Acquisition Agreement's finalization, and the fact that InMoment's Partnerships Director requested to discuss a "new Statement of Work" in April 2019. And Defendants' position is inconsistent with the fact that they paid InMoment in the amount set by SOW #1 for all of what would be SOW #1's second year without establishing a new

statement of work, and the fact that InMoment's senior contact at Ipsos requested to discuss a "change of the term" of the parties' agreement. Reasonable minds could differ as to these events' relevance to the intent of the parties in executing the Acquisition Agreement, and there is therefore a triable issue of fact as to whether the Acquisition Agreement was intended to transfer GfK's SOW #1 to Ipsos, or whether the parties operated from April 2019 until March 2020 under a separate, unwritten agreement. Summary judgment is therefore denied.

## II.     STATEMENT OF WORK #1

The foregoing provides a sufficient basis upon which to deny summary judgment. Even presuming that Defendants did assume SOW #1 through the Acquisition Agreement, however, there are alternative grounds for denying summary judgment. Specifically, the same factual disputes that create a jury question regarding the Acquisition Agreement are present with respect to SOW #1: ambiguities arise in the context of its conditions precedent, and extrinsic evidence regarding their intended meaning do not allow the court to interpret SOW #1 as a matter of law. These issues are most apparent with SOW #1's first condition precedent, which required a "successful migration of the existing JLR programs to the InMoment portal during year 1[.]" Before the court may reach this issue, however, it must address two preliminary questions raised by the parties: whether InMoment waived the right to enforce SOW #1 and whether Defendants waived the protection of SOW #1's conditions precedent.

### A.  INMOMENT'S WAIVER OF SOW #1

#### i.     Legal Standard

Under New York law,[3] contractual rights "may be waived if they are knowingly,

---

[3] SOW #1 does not contain a choice of law provision. For the same reasons articulated regarding the Acquisition Agreement, the court finds little reason to apply the laws of another state when both parties urged application of New York law in their briefs. Moreover, the factual record presents an additional reason why New York law may be said to govern SOW #1. The Reseller Agreement between InMoment and GfK contains a choice of law provision, which states that "the Law of the State of New York governs this Agreement[.]" *See* ECF No. 47-2, at 5. InMoment

voluntarily and intentionally abandoned[.]" *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104, 850 N.E.2d 653 (2006) (citing *Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184, 436 N.E.2d 1265 (1982)). "Such abandonment 'may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage[.]'" *Id.* (quoting *General Motors Acceptance Corp. v Clifton-Fine Cent. School Dist.*, 85 N.Y.2d 232, 236, 647 N.E.2d 1329 (1995)). However, waiver "should not be lightly presumed[,]" "must be based on a clear manifestation of intent to relinquish a contractual protection[,]" and generally presents a question of fact as to "the existence of an intent to forgo" the waived right. *Id.* (citations and internal quotation marks omitted).

### ii.    Analysis

Defendants insist that "InMoment voluntarily and intentionally waived its right to enforce SOW #1." ECF No. 54, at 58. In response to the onset of the COVID-19 pandemic in March 2020, JLR suspended its purchase order, informing Defendants that the JLR Program would discontinue for a period of at least six months. On March 25, 2020, InMoment's Senior Director of Customer Success, Chris Sparling, responded to this news, stating to his supervisors that "JLR have instructed Ipsos to suspend to programme for at least 6 months" and thus "Ipsos are no longer in contract with JLR." ECF No. 56-2, at 20. That same day, InMoment's Executive Vice President of Customers and Solutions, Mr. Brian Clark, sent an internal email regarding InMoment's global exposure in which Mr. Clark categorized InMoment's work for JLR among its "cancelled" clients. ECF No. 56-2, at 140. In subsequent internal emails, Mr. Sparling stated that "March [was] the

---

has recognized that SOW #1 was executed "under the Reseller Agreement to govern InMoment's work on the reporting portal for the customer experience insights program for JLR[.]" ECF No. 47, at 7. The court need not determine as a matter of law the extent to which SOW #1 incorporates each term and condition set forth in the Reseller Agreement. However, to the extent that the Reseller Agreement's choice of law provision is binding on that agreement's related SOW #1, it provides an additional reason supporting the application of New York law.

final month" of SOW #1 because "Ipsos do not have a contract with JLR from April onwards and billing from April onwards was dependent on this." ECF No. 54, at 9. Mr. Raher, InMoment's Partnerships Director, agreed that "[o]ur contract was 2 years with a 3rd year from April 20-April 21 that was valid only if Ipsos retained the JLR account, which they have not[.] We have now closed down the programme." ECF No. 56-2, at 2. On this basis, Defendants insist that InMoment's "unambiguous statements and unmistakable actions . . . demonstrate it forever waived its right to enforce SOW #1[.]" ECF No. 56, at 58.

       InMoment contests whether either Mr. Sparling or Mr. Raher possesses adequate personal knowledge for their statements to be considered in support of Defendants' waiver argument. The court need not resolve this dispute, however, because even in light of the statements of Mr. Sparling and Mr. Raher, Defendants fall short of the high bar to establish waiver of contractual rights. InMoment's internal communications provide some support for Defendants' assertion that InMoment acknowledged SOW #1 had been terminated. But the court questions how InMoment could clearly manifest its intent to waive SOW #1 through internal communications alone. Moreover, regardless of InMoment's internal communications, the JLR Program was not terminated in March 2020. Instead, the Program was suspended for a period that lasted roughly six months. InMoment kept JLR's access to the Program's portal open throughout this period. ECF Nos. 60-6, at 2–4; 56-2, at 20 ("JLR have instructed Ipsos to *suspend* the programme for at least 6 months[.]") (emphasis added). A few off-hand emails circulated internally, indicating an employee's understand that a program had been terminated, are not sufficient to demonstrate knowing, voluntary, and intentional abandonment of contractual rights—especially when the program at issue was in fact not terminated. The court therefore declines to find that InMoment waived its rights under SOW #1 when it recognized JLR's suspension of the program for six

months due to the onset of the COVID-19 pandemic.

### B. DEFENDANTS' WAIVER OF SOW #1'S CONDITIONS PRECEDENT

As InMoment argues, under New York law, a party waives its right to enforce a condition precedent by continuing to accept performance despite the failure of that condition precedent established for that party's benefit. *Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 283, 49 N.Y.S.3d 721, 728 (N.Y. App. Div. 2017) (citing 13 Richard A. Lord, Williston on Contracts § 39:31 at 697–698); *see also Gramercy Holdings I, LLC v. Matec S.R.L.*, No. 20-CV-3937-JPC, 2023 U.S. Dist. LEXIS 160271, at *154 (S.D.N.Y. Sept. 11, 2023).

At stated above, there exists a triable issue as to whether Defendants assumed SOW #1 through the Acquisition Agreement. And the court cannot determine whether Defendants waived the protection of SOW #1's conditions precedent before a jury determines whether SOW #1 is an agreement that binds Defendants in the first place. *See, e.g., Diffisuion Fin. S.A.R.L. v. Smith*, No. 95-CV-2140, 1997 U.S. Dist. LEXIS 7129, at *8–9 (S.D.N.Y. May 20, 1997) (citing John D. Calamari and Joseph M. Perillo, Contracts § 11-3 at 384 (2d ed. 1977)) ("*After* a contract has been formed, . . . its express terms may establish conditions that affect a party's duty to render a promised performance.") (emphasis added); *Hudson Nuerosurgery, PLLC v. UMR Inc.*, No. 20-CV-9642, 2023 U.S. Dist. LEXIS 174183, at *9–10 (S.D.N.Y. Sept. 28, 2023) (quoting *Goldstein v. Solucorp Indus., Ltd.*, No. 11-CV-6227, 2017 U.S. Dist. LEXIS 20294, 2017 WL 1078739, at *5 (S.D.N.Y. Feb. 10, 2017) ("[T]he parties to a contract can 'condition the performance of either party, or the validity of the entire contract itself, on the occurrence of an event.'")). Because the court cannot hold as a matter of law that SOW #1 constitutes a binding agreement between the parties, it cannot reach the issue of waiver of conditions precedent. And even if the court were to

hold that Defendants assumed SOW #1, there would remain triable issues of fact as to whether SOW #1's conditions precedent had been satisfied.

### C. AMBIGUITY

#### i. Legal Standard

Under New York law, a court looks to a contract's four corners to determine whether it is ambiguous as a matter of law. *JA Apparel Corp.*, 568 F.3d at 396. A contract is ambiguous and extrinsic evidence may be considered when reasonable minds could differ as to the meaning of the contract's terms. *Id.* at 397. But where extrinsic evidence creates a genuine issue of material fact as to the contracting parties' intent, summary judgment must be denied. *Faulkner*, 452 F. Supp. 2d at 375–76.

#### ii. SOW #1's "Successful Migration" Condition Precedent is Ambiguous as a Matter of Law

SOW #1's first condition precedent states, in its entirety, that InMoment was required to complete a "successful migration of the existing JLR programs to the InMoment portal during year 1[.]" ECF No. 49-3, at 3. This language, viewed solely within the context of the contract's four corners, is ambiguous as a matter of law because reasonable minds could differ as to its intended meaning. Both parties' preferred interpretations of this condition are reasonably supported by the agreement's text.

InMoment argues that SOW #1's first condition precedent required it to build a new platform on its software capable of running JLR's existing programs, migrate existing customer data onto that new platform, and launch that new website. ECF No. 7, at 20–21. Defendants, on the other hand, argue that the plain meaning of "successful migration" of "existing programs" required InMoment to do more than transfer data and activate a new website portal—the website also had to work. The plain language of SOW #1 appears to support this view, because JLR's

19

"existing programs" could not be successfully migrated to InMoment's platform otherwise. But SOW #1's text is entirely vague as to specifically what (if anything) InMoment was required to accomplish to satisfy this condition. A "successful migration" of JLR's "existing programs" presumably required the new website to be operable. But for how long? Was a "successful migration" contingent on some measure of JLR's ability to run its programs on InMoment's platform as well as it had on the preexisting Echo platform? How many issues could InMoment's new portal have, and of which types, before the migration of JLR's existing programs would no longer be "successful"? If the website launched in March 2019, but repairs were ongoing in April 2019, would a "successful migration" still have occurred "during year 1" as SOW #1 plainly requires? The contract's text answers none of these questions. Reasonable minds could differ as to what a "successful migration" required because the parties failed to define that term in SOW #1. The court therefore finds SOW #1's first condition precedent ambiguous as a matter of law.

### iii.   Extrinsic Evidence Creates a Triable Issue of Fact as to SOW #1's Intended Meaning

Moving beyond the four corners of SOW #1, the parties point to extrinsic evidence to prove or disprove that a successful migration of JLR's existing programs occurred in year one. But this disputed evidence neither permits the court to interpret the ambiguous contract as a matter of law nor to determine whether the condition was unambiguously satisfied. The court thus finds another ground upon which to deny summary judgment.

Defendants dispute that the first condition precedent was satisfied by pointing to evidence that after the new website's purportedly successful launch, the website had persistent operability issues that continued into what would have been SOW #1's second year. The first complaint regarding the website's inoperability was submitted by a user just thirteen minutes after InMoment launched the JLR CEIP's new portal. ECF No. 56-2, at 44. Throughout March 2019, the website

portal shut down and was deactivated multiple times due to system errors. *Id.* While InMoment maintains that its website could not have launched but for a "successful" data migration, evidence in the record shows that data migration continued after the website went live. *See* ECF No. 47-18, at 3. Even a month later, on April 12, 2019, JLR noted a number of issues with the website, including "issues with user permissions[,]" "erratic/unreliable" performance and speed of operability, lack of functionality when downloading exports from the home page, inability to use the "forgot password" feature, and more. ECF No. 56-1, at 331–34. As late as April 16, 2019— more than two weeks after SOW #1's first year passed—Defendants notified InMoment that the ongoing issues with the "platform performance" presented a "very serious situation" that had to be "escalated to a more senior level at JLR including their UK board[.]" ECF No. 56-1, at 349.

Defendants' evidence supports the inference that SOW #1 required InMoment to do more than migrate JLR's existing customer data and activate the new portal on its platform in order to satisfy the first condition precedent. At the same time, however, Defendants did not inform InMoment upon the expiration of SOW #1's first year that these operability problems constituted a failure to satisfy SOW #1's first condition precedent. Without evidence demonstrating the parties' intent in drafting SOW #1, a jury must weigh the relevant evidence, and the inferences that may reasonably be drawn from that evidence, to determine whether InMoment satisfied SOW #1's first condition precedent, which required a "successful migration of the existing JLR programs to the InMoment portal during year 1[.]"

For the foregoing reasons, the court denies InMoment's motion for partial summary judgment. If the court were inclined to grant InMoment's motion, however, it would face another quandary, because it is not clear which Defendant would be liable for the judgment. In its motion, InMoment collectively defined Defendants Market & Opinion Research International Limited and

Ipsos MORI UK Limited as "Ipsos" before asking the court to enter a $1,415,000 judgment against "Ipsos." ECF No. 47, at 1, 28. At oral argument, the court asked InMoment's counsel to clarify against which of the Defendants it was seeking judgment. Initially, counsel had no response. Before the end of the hearing, counsel informed the court of his "belief" that his client sought judgment against Ipsos (and not MORI). But InMoment's lack of clarity on this issue—and its failure to conduct discovery or adequately brief its motion to explain the basis for Ipsos's liability—provides one additional reason why summary judgment must be denied.

The court concludes by noting that at oral argument on the motion, Defendants' counsel argued for the first time that Defendants not only opposed InMoment's partial summary judgment motion but believed that *Defendants* were entitled to the entry of judgment as a matter of law. Counsel's oral motion is denied (to the extent that it was effectively made) because genuine disputes remain as to the material facts identified above. Fed. R. Civ. P. 56(a).

**ORDER**

For the reasons set forth in this Memorandum Decision and Order, Plaintiff's Motion for Partial Summary Judgment (ECF No. 47) is **DENIED**.

Signed February 6, 2024

BY THE COURT

Jill N. Parrish
United States District Court Judge

22